United States District Court
Southern District of Texas
**ENTERED**
September 21, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| vs. | § § § § § | CRIMINAL ACTION NO. H-12-600-1<br>CIVIL ACTION NO. H-19-2143 |
| EARNEST GIBSON III | § | |

## MEMORANDUM AND ORDER

A jury convicted Earnest Gibson III ("Gibson III")[1] on ten counts related to a scheme to defraud Medicare. In June 2015, he was sentenced to a 540-month prison term and ordered to pay $46,753,180.04 in restitution. (Docket Entry No. 508). The Fifth Circuit affirmed Gibson III's conviction and sentence in November 2017. *United States v. Gibson*, 875 F.3d 179 (5th Cir. 2017). The Supreme Court denied Gibson III's petition for a writ of *certiorari*, *Gibson v. United States*, 138 S. Ct. 2664 (2018), and his petition for rehearing, *Gibson v. United States*, 139 S. Ct. 1241 (2019). Gibson III has now moved to vacate, set aside, or correct his conviction and sentence. (Docket Entry No. 816). Based on Gibson III's motion and his amendments and supplements to the motion, the government's opposition, Gibson III's replies, the record, and the governing law, Gibson III's motion is denied, and final judgment is separately entered. The reasons are explained below.

**I.   The Legal Standard**

Title 28 U.S.C. § 2255 provides for relief "for errors that occurred at trial or sentencing." *Jeffers v. Chandler*, 253 F.3d 827, 830 (5th Cir. 2001). To prevail, Gibson III must show that: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the

---

[1] Gibson III's son was a codefendant. Gibson III is the father; Gibson IV is the son.

court lacked jurisdiction to impose the sentence; (3) the sentence exceeded the maximum allowed by law; or (4) the sentence is otherwise subject to collateral attack. *See United States v. Seyfert*, 67 F.3d 544,546 (5th Cir. 1995).

To prevail on a claim for ineffective assistance of counsel, Gibson III

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). The first prong of the *Strickland* test requires Gibson III to demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687–88. Reasonableness is measured against prevailing professional norms and must be viewed under the totality of the circumstances. *Id.* at 688. Review of counsel's performance is deferential. *Id.* at 689. In assessing prejudice, "*Strickland* asks whether it is reasonably likely the result would have been different," if not for counsel's deficient performance. *Harrington v. Richter*, 562 U.S. 86, 111 (2011)(internal quotation marks omitted).

II.     Analysis

   A.     Background

The Fifth Circuit summarized the background of the case in its decision affirming Gibson III's conviction and sentence. The summary follows:

> This case presents another instance of Medicare fraud involving Partial Hospitalization Programs (PHPs). PHPs are outpatient programs designed to provide daily, intensive treatment for patients suffering from an "acute exacerbation" of a chronic mental disorder. Houston's Riverside General Hospital (Riverside) ran PHPs, both onsite and at satellite locations. Riverside's Chief Executive Officer, president, and administrator was Gibson III. His son, Gibson IV, operated an affiliated, offsite PHP, Devotions Care Solutions (Devotions).

2

In 2006, Medicare approved Riverside and its PHPs to submit reimbursement claims. Not surprisingly, a PHP costs more to operate than does a standard outpatient service. So it is also unsurprising that Medicare attached several strings to its PHP coverage.

One condition was patient eligibility. To bill Medicare for PHP services, a physician needed to certify that the Medicare beneficiary required treatment comparable with inpatient care. Naturally, a patient must have had "the capacity for active participation in all phases of the multidisciplinary and multimodal program." Patients diagnosed with Alzheimer's or dementia, for example, would raise "red flag[s]" for Medicare.

The type of treatment mattered, too. A doctor must have certified that the PHP services would be "furnished while the individual [wa]s under the care of a physician" according to "an individualized written plan of care." Expressly excluded from Medicare coverage were, to name a few: "services to hospital inpatients and meals, self-administered medications and transportation"; "custodial or respite care"; "programs attempting to maintain psychiatric wellness"; "daycare programs for the chronically mentally ill"; and "services to a nursing facility resident that should be expected to be provided by the nursing facility staff." And if a hospital operated an offsite PHP—like Gibson IV's Devotions—treatment must have occurred under a licensed physician's "direct supervision." That meant the physician had to be "physically present" in the office suite housing the offsite PHP and "immediately available to provide assistance and direction throughout the time the employee is performing services."

Medicare also imposed timing requirements. A PHP patient needed to receive "active treatment" at least four days and twenty hours a week. And if a patient's condition "improve[d] or stabilize[d]," or if she could not benefit from "the intensive multimodal treatment available in the PHP," the PHP had to discharge her.

In 2006—and again in 2008, 2009, and 2011—Gibson III certified that Riverside's PHPs complied with "the laws, regulations and program instructions of the Medicare program." That, according to the government, turned out to be false. As the prosecutors put it, Riverside submitted on behalf of its PHPs $160,336,451.90 in Medicare bills, and Medicare paid $46,753,180.04 before realizing it had been swindled.

> On October 1, 2012, a grand jury in the Southern District of Texas indicted Gibson III, Gibson IV, and five others on thirteen counts, alleging various illegal schemes relating to Riverside PHPs. Facing the prospect of a jury trial, three defendants pleaded guilty. Two of them turned government's witnesses to testify against the Gibsons. By contrast, the Gibsons put the government to its burden.
>
> Thus ensued a month-long trial. On October 20, 2014, a jury convicted Gibson III of conspiracy to commit healthcare fraud (Count 1), conspiracy to defraud the government and violate the Anti-Kickback Statute (AKS) (Count 2), seven substantive kickback offenses (Counts 3, 4, 5, 7, 9, 11 & 12), and conspiracy to commit money laundering promotion (Count 13).2 The jury found Gibson IV guilty on each conspiracy charge (Counts 1, 2 & 13) and two substantive kickback offenses (Counts 11 & 12). Soon after, the district court sentenced Gibson III to 540 months' imprisonment and $46,753,180.04 in restitution.

*United States v. Gibson*, 875 F.3d 179, 184–85 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 2664 (2018), *reh'g denied*, 139 S. Ct. 1241 (2019).

    **B.**    **The Claims of Ineffective Assistance of Counsel**

Gibson III claims that his trial counsel, Dick DeGuerin, failed to research and investigate relevant law and failed to challenge the government's evidence of a kickback conspiracy. Both claims are analyzed below.

    **1.**    **Failure to Investigate**

Gibson III argues that counsel failed to research federal law regarding PHPs and to challenge the status of the PHPs as off-site facilities affiliated with Riverside. He argues that the Riverside facilities the government portrayed as off-site PHP facilities were in buildings that Riverside owned or leased and therefore qualified as on-site PHPs not requiring a doctor's supervision. Gibson III argues that counsel failed to research the law needed to understand that the PHPs qualified as on-site and failed to challenge the government's evidence.

4

Trial counsel filed an affidavit in response to Gibson III's motion. The affidavit set out counsel's research into the relevant statutes and regulations, his visits to several of Riverside's on- and off-campus locations, and his awareness of the different requirements for off-site and on-site PHPs. (Docket Entry No. 841 at 3). Gibson III offers no evidence to counter the sworn statements about counsel's research and knowledge. Gibson III's conclusory allegations do not show deficient representation.

The record shows that trial counsel cross-examined government witnesses and tried to show that violations of Medicare rules did not amount to fraud. He obtained a jury instruction to this effect. *See* Docket Entry No. 368 at 1101. Trial counsel argued that any rule violations were not evidence of fraud; that Gibson III had no knowledge of any fraudulent activity; that Gibson III put policies in place to prevent fraud; and that any fraud that did occur was committed by others and without his knowledge. *See, e.g.*, Docket Entry No. 402 at 5301, 5308-10. The jury decided otherwise, with ample support in the record.

The record evidence, both at trial and in connection with this motion, shows that trial counsel conducted a thorough investigation and research into the facts and relevant law. Counsel made a valid determination that the facilities at issue, some located miles from Riverside General's campus, were offsite PHPs. He vigorously challenged the government's case. He also presented evidence that Gibson III did not commit fraud but was victimized by those around him. This reasonable strategy requires deference. The record shows no deficient performance or prejudice.

    2.  **Failure to Object**

Gibson III also claims that trial counsel failed to object to evidence that he conspired to pay kickbacks. He argues that counsel should have objected to the government's use of the word "referral," arguing that, in the context of the anti-kickback statute, "referral" applies only to

5

money paid to physicians. The anti-kickback statute prohibits both the payment and receipt of remuneration for patient referrals, whether a physician is involved or not. *See*, *e.g.*, *United States v. McCardell*, 750 F. App'x 314, 2018 WL 4697252 (5th Cir. Sept. 28, 2018) (registered nurse); *United States v. Gevorgyan*, 886 F.3d 450, 452 (5th Cir. 2018) (office manager). Counsel's failure to argue an incorrect statement of the law does not constitute ineffective assistance of counsel.

### 3. Sufficiency of the Evidence

Gibson III argues that the evidence was insufficient to support his conviction. He raised this claim on direct appeal, and the Fifth Circuit rejected it. *See Gibson*, 875 F.3d at 186-87. There is no basis for this court to reconsider the claim.

### C. Procedurally Defaulted Claims

Any claims for relief that Gibson III could have raised on direct appeal, but did not, are procedurally defaulted. To obtain relief on these claims, Gibson III must show cause for his default and actual prejudice.

> Once the defendant's chance to appeal has been . . . exhausted . . . we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum . . . . For this reason, we have long and consistently affirmed that a collateral challenge may not do service for an appeal.

*United States v. Frady*, 456 U.S. 152, 167–68 (1982). These claims are addressed separately below.

### 1. The Fourth Amendment Claims

In two claims, Gibson III contends that his conviction was the result of evidence gathered through an unconstitutional search and seizure. He does not identify the specific evidence he claims was improperly obtained.

6

Gibson III had a full and fair opportunity to litigate this Fourth Amendment claim in the trial court, and he does not show any deficient performance by counsel in failing to do so. *See, e.g.*, *United States v. Johnson*, 457 U.S. 537, 562 n.20 (1982); *Stone v. Powell*, 428 U.S. 465, 494 (1976); *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Gibson III does not allege that he was denied the opportunity to raise his Fourth Amendment claims at trial, or that his counsel was ineffective for failing to raise them. Relief is unavailable on these claims.

### 2. The Fifth Amendment Claim

Gibson III contends that the government obtained statements from him, in violation of his Fifth Amendment rights. He does not identify any statement obtained in violation of his rights. Nor does he explain why he did not raise this issue either in a motion to suppress during trial or on appeal. This claim is procedurally defaulted. Gibson III makes no showing of cause to excuse that default. Relief is unavailable on this claim.

### 3. The Claim of the Failure to Disclose Favorable Evidence

Gibson III alleges that the government failed to disclose the identities of confidential informants and that this information may have helped his defense. A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108 (1976). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The evidence of Gibson III's guilt was overwhelming. As summarized by the Fifth Circuit:

> The evidence against Gibson III was . . . powerful. One PHP supervisor explained that he and Gibson III entered two contracts; one to pay the supervisor a percentage of Riverside's Medicare returns, and another to pay him $16,000 each month he referred 26

7

to 30 Medicare patients to a Riverside PHP. The supervisor further admitted to paying marketers to meet his patient quota. What is more, he testified that Gibson III tracked those marketers' locations with a spreadsheet. According to the supervisor, Gibson III also talked about the "census"—the number of billable patients in a PHP—"all the time." The instructions were to "keep [the] census up," else Gibson III would terminate their contract. And this was no rare threat. The boss sent several letters warning the supervisor to bring in more patients to increase Riverside's "market share."

That supervisor was one of many informants who implicated Gibson III. A patient recruiter explained how Gibson III skirted Medicare rules by directing PHPs to keep beneficiaries for 90 days, put them in onsite "aftercare" programs to watch television for a few weeks, and then readmit those patients to avoid losing them to competitor-PHPs. A behavioral-health technician testified that the PHPs often admitted ineligible patients and rendered bogus treatment. The jury also learned that Gibson III heard complaints that the only on-duty psychiatrist was often absent and failed to fill out necessary patient forms. But those complaints fell on deaf ears and into obstructive hands. When an exasperated PHP supervisor finally replaced that psychiatrist with someone willing to do the work, Gibson III pulled rank and reinstated the absentee doctor.

The testimony unveiled similar shenanigans at other Riverside PHPs. One worker revealed that his PHP's assigned psychiatrist showed up only once a week. Another testified that some patients waited a fortnight in a cafeteria before seeing a doctor. And the patients themselves grew impatient; they consistently complained that they couldn't see a doctor. Still more evidence showed that Devotions violated Medicare rules by permitting nurse practitioners to admit and discharge patients.

Even Gibson III's own testimony supported the verdict. He admitted he knew that Medicare required a psychiatrist to be present full-time at every PHP, and that one psychiatrist was assigned to be at two places at once. He conceded he also knew Medicare had reimbursed Riverside for "false claims," but failed to alert Medicare or fire the people responsible. He further acknowledged he reviewed compliance memoranda and internal audits exposing fraud, but the conduct continued.

*United States v. Gibson*, 875 F.3d 179, 186–87 (5th Cir. 2017) (footnote omitted).

Gibson III does not explain how he was prejudiced by the alleged failure to disclose the confidential sources in light of this voluminous evidence of his guilt. *Cf. Roviaro v. United*

*States*, 353 U.S. 53, 64 (1957) (the undisclosed informant was the only participant in the crime other than the accused, and "the only witness in a position to amplify or contradict the testimony of government witnesses"). This is not a case like *Roviaro*, in which the confidential informant was the only person besides the defendant with firsthand knowledge of the alleged crime. Here, many witnesses testified to the fraudulent activity and the kickback scheme and Gibson III's involvement.

Gibson III does not argue that this claim is based on newly discovered evidence, and he does not explain why the claim was not raised on direct appeal. Gibson III's trial counsel's affidavit submitted in connection with this collateral challenge states that counsel received all relevant discovery. (Docket Entry No. 841 at 2). This claim is procedurally defaulted. Relief is unavailable.

### 4. The Confrontation Claim

Gibson III claims that his Sixth Amendment confrontation rights were violated when the government did not call as witnesses Mohammed Khan or the confidential informants. The Supreme Court has made clear that the confrontation clause applies only to testimonial statements. These statements include trial testimony or out-of-court statements that are used as evidence against the defendant, such as affidavits, custodial examinations, and prior testimony that was not subject to cross-examination by the defendant. *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004).

Gibson III complains that he did not have an opportunity to cross-examine informants who were not witnesses at trial. But he points to no out-of-court statement by any of these individuals that was used as evidence against him. He fails to identify any violation of his right to confront witnesses. Nor does he offer any explanation for not raising this claim on direct appeal. This claim is procedurally defaulted. Relief is unavailable.

### 5. The Claim Under the Sentencing Guidelines

Gibson III contends that "the Court erred when it allowed the government . . . to cause Gibson III wrongfully determined by the government's own PSI to be the organizer and leader." Gibson III neither explains why he did not raise this claim on direct appeal nor offers any evidence in support. This claim is procedurally defaulted and conclusory. Relief is unavailable.

### 6. The Entrapment Claim

Throughout Gibson III's briefs is a running theme that his prosecution resulted from an elaborate government scheme to entrap him. Gibson III offers no explanation for why he did not raise this claim on direct appeal. It is procedurally defaulted on that basis. And he fails to identify any government action that induced him to engage in criminal activity. The extensive evidence of Gibson III's active, ongoing involvement in fraudulent activity, summarized above makes clear that a claim of entrapment is without merit. Relief is unavailable.

## III. Conclusion and Denial of Certificate of Appealability

Gibson III has not requested a certificate of appealability, but the court may determine whether he is entitled to this relief. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district courts to deny COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued."). A petitioner may obtain a certificate either from the district court or an appellate court, but an appellate court will not consider a request until the district court has denied it. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A certificate of appealability may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner "makes a

10

substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).

Gibson III's motion and supporting arguments are long, rambling, and difficult to decipher. His claims for relief revolve around broad and unfounded claims that the government carried out a conspiracy to entrap him and deprive him of funds to mount a defense. This court has carefully reviewed the record and found that Gibson III has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Gibson III is not entitled to a certificate of appealability.

Earnest Gibson III's motion to vacate, set aside, or correct sentence, (Docket Entry No. 816), is denied. No certificate of appealability is issued. Final judgment in the civil case, 4:19-cv-2143, is entered by separate order.

SIGNED on September 21, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge